**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-2729 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| WAIL TALAB SALEM | ) | |
| a/k/a WAEL TALAH, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Salem applied for U.S. citizenship while in the midst of committing a crime spree. He stole millions of dollars from the federal government's food stamp program, which feeds the needy. He made no mention of his long-running, multi-million-dollar theft when he represented to the Immigration and Naturalization Service that he was a law-abiding resident. The federal government took him at his word, and granted his request to become a U.S. citizen.

Salem defrauded the government that granted him citizenship. But the fraud ultimately caught up with him. He was indicted a few years later, and before long he pleaded guilty to twelve counts, including mail fraud, food stamp fraud, identity document fraud, and tax obstruction. Nine of the twelve crimes took place during the relevant period for the citizenship application. He received a sentence of 56 months.

The United States filed this action to denaturalize Salem based on his crimes, and later moved for summary judgment. The material facts are undisputed: Salem defrauded the government, and then lied about it. He defrauded the USDA, and then defrauded the INS. The motion is granted.

## Background

The government supported its motion for summary judgment by filing a Rule 56.1 statement of material facts, complete with supporting evidence. Salem filed no response. Salem's failure to respond "results in deeming admitted the uncontroverted statements" in the government's Rule 56.1 submission. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *see also* L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").

Defendant Wail Salem was born in Jordan in 1965. *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 2 (Dckt. No. 44); Application for Naturalization (Dckt. No. 42-6, at 2 of 5). He came to the United States on a student visa in January 1986. *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 3. About three years later, he married a naturalized U.S. citizen and became a permanent resident. *Id.* at ¶ 4.

Salem owned several small neighborhood grocery stores in Chicago. *Id.* at ¶ 16. He participated in the food stamp program run by the U.S. Department of Agriculture ("USDA"). *Id.* The USDA entrusted Salem with authorization codes and "Food Stamp Redemption Certificates" so that he could sell food to the needy. *Id.*

Salem betrayed the government's trust. From April 1989 to June 1995, he stole money from the food stamp program. *Id.* at ¶ 11. He "obtained food stamp coupons through illicit means," and then "redeem[ed] the food stamp coupons at banks for U.S. currency." *Id.* at ¶ 16. He redeemed the coupons knowing that consumers hadn't used them to buy food. *Id.* at ¶ 17.

All told, Salem siphoned about $10 million from the food stamp program. *Id.* at ¶ 19. He covered his theft by stashing the funds in various bank accounts, including 14 accounts opened under the false name "Wael Talah." *Id.* at ¶¶ 19–20. He failed to pay taxes, too.

2

Between January 1991 and June 1995, he failed to file tax returns with the IRS, hiding the money from the agency and preventing it from determining the amount and source of his income. *Id.* at ¶¶ 18, 21.

Meanwhile, Salem applied to become a citizen of the country that he was defrauding. In October 1992, Salem applied for naturalization by submitting an Application for Naturalization ("Form N-400") with the Immigration and Naturalization Service ("INS"). *Id.* at ¶ 25; Application for Naturalization (Dckt. No. 42-6, at 2 of 5).

The form posed a series of questions. One of the questions asked: "Have you ever: (a) knowingly committed any crime for which you have not been arrested?" *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 26 (Dckt. No. 44). There were two choices: "Yes" and "No." In response, Salem checked a box and gave an unequivocal answer: "No." *Id.* at ¶ 27; *see also* Application for Naturalization (Dckt. No. 42-6, at 4 of 5).

The form also required Salem to "certify . . . under penalty of perjury under the laws of the United States of America that this application, and the evidence submitted with it, is all true and correct." *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 28 (Dckt. No. 44). Salem signed his name below that certification, swearing under penalty of perjury that he was truthful. *Id.* at ¶ 29.

After submitting the form, Salem sat for an interview with the INS in May 1993. *Id.* at ¶ 30. Salem swore under oath that he would answer all of the questions truthfully. *Id.* at ¶ 31. The INS officer asked Salem if he had ever knowingly committed a crime for which he had not been arrested. *Id.* at ¶ 32. Once again, Salem answered "no." *Id.* at ¶ 33. At the end of his interview, he signed his Form N-400 again, verifying a second time that he was telling the truth. *Id.* at ¶ 34; Application for Naturalization (Dckt. No. 42-6, at 5 of 5).

The INS approved Salem's naturalization application in October 1994.  *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 37 (Dckt. No. 44).  Two months later, he took the Oath of Allegiance to become a U.S. citizen.  *Id.* at ¶¶ 5, 38.

Fraudulent schemes often unravel, and Salem's scam was no exception.  He was arrested in December 1997.  *Id.* at ¶ 12.  In February 1998, a grand jury indicted him on seventeen criminal counts.  *Id.* at ¶ 13.  The charges included mail fraud, food stamp fraud, identity document fraud, and obstruction of the IRS.  *Id.*; *see also* Indictment (Dckt. No. 42-2).

Salem signed a plea agreement – with the assistance of counsel – before the end of the year.  *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶¶ 14, 22 (Dckt. No. 44); Plea Agreement (Dckt. No. 42-3).  He agreed to plead guilty to twelve counts, including five counts of mail fraud (Counts 1–5), five counts of food stamp fraud (Counts 6, 9, 12, 16, & 17), one count of identity document fraud (Count 18), and one count of obstruction of the IRS (Count 24).  *See* Plea Agreement, at 2.  Nine of the twelve crimes took place before naturalization.  *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 15.

In the Plea Agreement, Salem agreed to "plead guilty because he is in fact guilty of the charges."  *See* Plea Agreement, at ¶ 5 (Dckt. No. 42-3); *see also* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 22 (Dckt. No. 44).  He also agreed that no one had threatened him:  "Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty."  *See* Plea Agreement, at ¶ 19.  The Plea Agreement was "entirely voluntary."  *Id.* at 1.

The Court accepted his guilty plea.  *See* Plea Transcript (Dckt. No. 42-5).  Before doing so, the Court asked Salem to confirm that no one had threatened him, and that no one had made

any promises to him apart from the plea agreement.  *Id.* at 18–19.  Salem represented to the Court that his guilty plea was entirely voluntary, and that he was pleading guilty because he was in fact guilty.  *Id.* at 19.

On March 5, 1999, Salem received a sentence of 56 months imprisonment for each count, with each sentence running concurrently.  *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 23 (Dckt. No. 44).  The Court also ordered restitution totaling $9,845,000.  *Id.* at ¶ 24; *see also* Judgment (Dckt. No. 42-4).

Salem never disclosed his criminal activities to the INS during the naturalization process. *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 35 (Dckt. No. 44).  If the INS had known about his illegal conduct, the INS would have been required to deny his application.  *Id.* at ¶ 36.

In 2019, the United States filed this action to revoke Salem's citizenship under 8 U.S.C. § 1451(a).  *See* Cplt. (Dckt. No. 1).  The statute provides that it "shall be the duty" of the United States Attorney to bring suit "for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation."  *See* 8 U.S.C. § 1451(a).

The complaint contains four counts, and each rests on a different statutory basis for revoking Salem's citizenship.  Three of the four counts allege that Salem lacked good moral character within the meaning of 8 U.S.C. § 1101(f).  Specifically, the government alleges that Salem committed a crime involving moral turpitude (Count I), committed unlawful acts that reflected adversely on his moral character (Count II), and gave false testimony under oath for the

purpose of becoming a citizen (Count III). In Count IV, the United States alleges that Salem procured his citizenship by concealment of a material fact and by willful misrepresentation.

Salem answered the complaint in November 2019, and included a number of denials. *See* Answer (Dckt. No. 23). The government filed its motion for summary judgment on February 28, 2020. *See* Dckt. No. 40. But at that point, Salem went off the grid.

Salem's counsel lost contact with his client. He filed multiple motions to withdraw, claiming that Salem was AWOL and couldn't be found. *See* Dckt. Nos. 29, 36, 47, 53, 61. Two weeks before the government moved for summary judgment, Salem's counsel reported that Salem "has failed to communicate with counsel; has failed to respond to correspondence; has failed to return phone calls; and has failed to appear for a scheduled appointment with counsel." *See* Dckt. No. 36. One month later, Salem's counsel reiterated that he "has had no contact with Defendant" and that Salem "refuses to communicate with counsel." *See* Dckt. No. 53.

The Court denied the motions to withdraw because of the high stakes, and because the attorney knew about the high stakes when he entered the fray and agreed to represent him. "Salem has a need for counsel in this case given the high stakes. The government is seeking to revoke Salem's citizenship. Salem may be non-communicative, but counsel's departure would make the situation worse, not better. Simply put, counsel needs to protect his client's interests because they need protecting." *See* 3/31/20 Order (Dckt. No. 57).

Salem's attorney didn't seem all that concerned that his client might lose his citizenship. When this Court suggested that he knock on Salem's door, the attorney fired off a tart letter to the Court: "I am not going to my client's house to knock on his door." *See* 3/30/20 Letter (Dckt. No. 56). The lawyer explained that he wasn't getting paid, and he "did not agree to represent

6

him for free." *Id.* True, Salem might lose his citizenship, but *c'est la vie* – that was "his choice." *Id.* "Apparently, he has no interest in his citizenship." *Id.*

The Court directed Salem's counsel to stay in the case, because Salem needed an advocate. The Court ordered Salem's counsel to make repeated efforts to find his client, and file status reports about his progress. The Court also ordered the government to help find Salem, too. *See* 3/10/20 Order (Dckt. No. 49).

The lawyer didn't reach Salem, but he did file the reports. *See* Dckt. Nos. 52, 64, 68. The reports showed that counsel tried to reach Salem by phone, email, and letter. *Id.* The Court ordered Salem's counsel to file a response to the motion for summary judgment anyway, and gave him six months to do so.

Salem's counsel ultimately mustered a four-page brief. *See* Def.'s Resp. to Pl.'s Mtn. for Summary Judgment (Dckt. No. 71). Salem's counsel filed the response on September 2, 2020, one week past the Court's deadline. *Id.* The brief was unsigned, too, in violation of the Federal Rules. *See* Fed. R. Civ. P. 11(a). The Court struck the response. *See* 9/2/20 Order (Dckt. No. 75). Still, the Court took the arguments into consideration.

## Legal Standard

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth

specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "'consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

A "nonmovant's failure to respond to a summary judgment motion . . . does not, of course, automatically result in judgment for the movant." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (internal citations omitted). "The ultimate burden of persuasion remains with [the government] to show that it is entitled to judgment as a matter of law." *Id.*

## Analysis

American citizenship is a "right no less precious than life or liberty." *Klapprott v. United States*, 335 U.S. 601, 616 (1949) (Rutledge, J., concurring). "[T]he right to acquire American citizenship is a precious one," and "once citizenship has been acquired, its loss can have severe and unsettling consequences." *Fedorenko v. United States*, 449 U.S. 490, 505 (1981); *see also Schneiderman v. United States*, 320 U.S. 118, 122 (1943) ("For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men."). People all around the globe want to become U.S. citizens, and rightly so.

"Denaturalizing an American citizen is not done lightly . . . ." *United States v. Dave*, 652 F. App'x 468, 470 (7th Cir. 2016); *see also Afroyim v. Rusk*, 387 U.S. 253, 267–68 (1967)

8

("Citizenship is no light trifle to be jeopardized . . . ."). The government must shoulder the "heavy burden" of justifying denaturalization by "clear, unequivocal, and convincing" evidence that does not "leave the issue in doubt." *Fedorenko*, 449 U.S. at 505 (cleaned up). "Any less exacting standard would be inconsistent with the importance of the right that is at stake . . . ." *Id.* at 505–06.

At the same time, the Court has an obligation to ensure "strict compliance" with all of the statutory requirements for naturalization. *Dave*, 652 F. App'x at 470 (citing *Fedorenko*, 449 U.S. at 506). "No alien has the slightest right to naturalization unless all statutory requirements are complied with." *United States v. Ginsberg*, 243 U.S. 472, 475 (1917). Courts demand "strict compliance" because Congress alone has the constitutional power to set rules for naturalization. *See INS v. Pangilinan*, 486 U.S. 875, 884 (1988); U.S. Const. art. I, § 8, cl. 4. "This judicial insistence on strict compliance with the statutory conditions precedent to naturalization is simply an acknowledgement of the fact that Congress alone has the constitutional authority to prescribe rules for naturalization, and the courts' task is to assure compliance with the particular prerequisites to the acquisition of the United States citizenship by naturalization legislated to safeguard the integrity of this 'priceless treasure.'" *Fedorenko*, 449 U.S. at 506–07 (citation omitted).

An applicant's failure to comply with a condition means that his citizenship was "illegally procured," and his naturalization must be set aside. *See* 8 U.S.C. § 1451(a). "Citizenship is 'illegally procured' within the meaning of § 1451(a) when it is procured by a person who was statutorily ineligible for naturalization." *United States v. Ahmed*, 2019 WL 4894350, at *3 (N.D. Ill. 2019) (Dow, J.); *Fedorenko*, 449 U.S. at 514 ("[O]ur cases have established that a naturalized citizen's failure to comply with the statutory prerequisites for

9

naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)."); *United States v. Suarez*, 664 F.3d 655, 658 (7th Cir. 2011); *United States v. Ep*, 2003 WL 22118926, at *3 (N.D. Ill. 2003).

One of the requirements for naturalization is good moral character. *See* 8 U.S.C. § 1427(a). "No person" may become a citizen unless that person "(3) during all the periods referred to in this subsection has been and still is a person of good moral character . . . ." *Id.*; *see also* 8 C.F.R. § 316.10(a)(1) ("An applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character.").

Putting the three pieces together, Salem needed to have "good moral character" when he applied for citizenship. *See* 8 U.S.C. § 1427(a). If he lacked good moral character, then he was ineligible for citizenship. *Id.* And if he was ineligible for citizenship, but became a citizen anyway, then citizenship was "illegally procured." *See* 8 U.S.C. § 1451(a).

The government moved for summary judgment on all four counts of the complaint. Counts I through III allege that Salem lacked good moral character during the period in question. *See* Cplt., at ¶¶ 43–70 (Dckt. No. 1). The government offers three reasons: (1) the commission of a crime involving moral turpitude (Count I); (2) the performance of unlawful acts reflecting on moral character (Count II); and (3) false testimony (Count III). Count IV alleges that Salem obtained his citizenship by concealing material information. *Id.* at ¶¶ 71–79. The Court will address each count in turn.

## I.    Crimes Involving Moral Turpitude (Count I)

To become a citizen, an applicant must be a "person of good moral character." *See* 8 U.S.C. § 1427(a). When he or she is married to a citizen, the applicant must demonstrate good moral character during the three years before filing the application, and until taking the Oath of

Allegiance and becoming a citizen. *Id.* at § 1430(a); 8 CFR §§ 316.10(a)(1), 319.1(a). Here, Salem needed to demonstrate good moral character beginning on October 7, 1989 (that is, three years before he applied) and continuing until he took the oath on December 6, 1994. *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 15 (Dckt. No. 44).

The statute does not define what it means to have good moral character. *See* 8 U.S.C. § 1101(f). Instead, the statute gives a number of examples of what it means to lack good moral character. *See United States v. Suarez*, 2010 WL 3418281, at *4 (N.D. Ill. 2010) ("While the Immigration and Naturalization Act ('INA') does not specifically define what 'good moral character' is, it quite clearly states what it is not."). A "habitual drunkard" lacks good moral character, and so does a person "whose income is derived principally from illegal gambling activities." *See* 8 U.S.C. § 1101(f)(1), (4). The list is non-exhaustive. *See United States v. Suarez*, 664 F.3d 655, 660 (7th Cir. 2011); *United States v. Nepal*, 894 F.3d 204, 211 (5th Cir. 2018); *United States v. Dor*, 729 F. App'x 793, 797 (11th Cir. 2018). The text also includes a catch-all for "other reasons." *See* 8 U.S.C. § 1101(f).

One of the examples involves crimes of moral turpitude. The statute provides that "[n]o person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was . . . a member of one or more of the classes of persons, whether inadmissible or not, described in . . . subparagraphs (A) and (B) of section 1182(a)(2) of this title." *See* 8 U.S.C. § 1101(f)(3). Section 1182(a)(2)(A)(i), in turn, involves an "alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of – (I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime . . . ." *See* 8 U.S.C. § 1182(a)(2)(A)(i).

11

Taken together, an applicant lacks good moral character if he or she (1) commits a crime involving moral turpitude; (2) during the statutory period; and (3) later is convicted of the crime or admits the crimes or the criminal acts. *See* 8 U.S.C. § 1101(f)(3) (cross-referencing 8 U.S.C. § 1182(a)(2)(A)); *see also* 8 C.F.R. § 316.10(b)(2)(i).

The record readily establishes that Salem pleaded guilty to, and was convicted of, multiple crimes. *See generally*, Indictment (Dckt. No. 42-2); Plea Agreement (Dckt. No. 42-3); Judgment (Dckt. No. 42-4). Of the seventeen counts in his indictment, Salem pleaded guilty to twelve. *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 13 (Dckt. No. 44).

Nine of the twelve crimes occurred between October 1989 and December 1994, the statutory period for good moral character. *Id.* at ¶¶ 13–15. Those nine counts include: (1) three counts of mail fraud under 18 U.SC. § 1341; (2) four counts of food stamp fraud under 7 U.S.C. §§ 2024(b), 2024(c); (3) one count of identity document fraud under 18 U.S.C. § 1028(a)(4); and (4) one count of tax obstruction under 26 U.S.C. § 7212(a). *Id.* ¶ 15.

So, Salem committed nine crimes during the statutory period necessary to prove good moral character. He admitted his complicity and was convicted. Therefore, the record satisfies the second and third elements of the lack-of-good moral character analysis. But that's not the end of things. The Court must determine if Salem's nine crimes constitute crimes of moral turpitude.

Although the statute itself does not define a "crime involving moral turpitude," courts have painted the concept in broad strokes. *See* 8 U.S.C. § 1182(a)(2)(A)(i). Moral turpitude "refers generally to conduct which is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Padilla v. Gonzales*, 397 F.3d 1016, 1019 (7th Cir. 2005) (citation omitted); *Lagunas-Salgado v.*

*Holder*, 584 F.3d 707, 710 (7th Cir. 2009). Such crimes are "serious" and "deliberate." *Mei v. Ashcroft*, 393 F.3d 737, 740–41 (7th Cir. 2004).

Crimes involving fraud "have always been regarded as involving moral turpitude." *Jordan v. De George*, 341 U.S. 223, 232 (1951); *Marin-Rodriquez v. Holder*, 710 F.3d 734, 738 (7th Cir. 2013) ("Crimes entailing an intent to deceive or defraud are unquestionably morally turpitudinous."); *Ghani v. Holder*, 557 F.3d 836, 840 (7th Cir. 2009); *Abdelqadar v. Gonzale*s, 413 F.3d 668, 671 (7th Cir 2005) ("Crimes entailing deceit or false statement are within the core of the common-law understanding of 'moral turpitude.'"). Fraud involves intent to deceive, and intent to deceive is the epitome of moral turpitude. What's more, "almost all courts have held that 'intentionally deceiving the government involves moral turpitude.'" *Padilla*, 397 F.3d at 1020 (citation omitted).

In the parallel context of removal proceedings, courts often look at the elements of the defendant's offense and the charging papers to determine whether he committed a crime involving moral turpitude. *See Abdelqadar*, 413 F.3d at 672 (describing the Supreme Court's holding in *Taylor v. United States*, 495 U.S. 575, 600–02 (1990), that "a court should look no farther than the elements of the offense and the charging papers"); *see also Marin-Rodriguez*, 710 F.3d at 737–38 (describing a similar, although modified, analysis when reviewing an Immigration Judge's decision). The Court follows suit here.

Each of Salem's violations involved an intent to deceive or defraud. For example, the mail fraud statute prohibits a person who "ha[s] devised or intend[s] to devise any scheme or artifice to defraud" from placing something in the mail "for the purpose of executing such scheme or artifice or attempting so to do." *See* 18 U.S.C. § 1341; *see also United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006) (identifying the elements of mail fraud: "(1) a scheme

13

to defraud; (2) an intent to defraud; and (3) use of the mails . . . in furtherance of the scheme"). The statute prohibiting food stamp fraud includes similar language. A person who "knowingly uses, transfers, acquires, alters or possesses" food stamps "in any manner contrary to" the statute, or presents those illicitly acquired food stamps "for payment or redemption of the value of $100 or more" is guilty of a felony. *See* 7 U.S.C. § 2024(b), (c). The identity document fraud similarly prohibits the "knowing[] possess[ion] [of] . . a false identification document, with the intent such document or feature be used to defraud the United States." 18 U.S.C. § 1028(a)(4).

Based on the elements of the charges against him, Salem's convictions for mail fraud, food stamp fraud, and identity document fraud qualify as crimes involving moral turpitude.

The Seventh Circuit considered food stamp fraud in the removal context and held that the crime involved moral turpitude. *See Abdelqadar v. Gonzales*, 413 F.3d 668 (7th Cir. 2005). In *Abdelqadar*, the Court reviewed the removal order of a man convicted of buying food stamps from welfare recipients. *Id.* at 670. Based on the underlying charging documents, and the plaintiff's admissions when he pleaded guilty, the Seventh Circuit found that he had "purchased the food stamps for cash and arranged to deceive the State of Illinois about the stamps' provenance so that he could make a profit. That concession put[] his conviction on the 'crime of moral turpitude' side of any divide." *Id.* at 672.

So too here. Salem deceived the USDA, illegally obtained food stamps, and cashed in the tokens at multiple banks. He then hid his earnings from the IRS, further defrauding the U.S government. He stole money from the federal government, and didn't pay taxes on what he stole, either. Salem did not skate the line of moral turpitude – he blew right past it.

Salem committed crimes involving moral turpitude during the statutory period, and was convicted of those crimes. That means he lacked good moral character when he filed his

citizenship application.  *See* 8 U.S.C. § 1101(f)(3).  The Court grants the government's motion

for summary judgment on Count I.

## II.      Commission of Unlawful Acts (Count II)

The government also moved for summary judgment on Count II.  It argues that even if

Salem's crimes did not involve moral turpitude, he would have been ineligible for citizenship

because he was convicted of unlawful *acts* that adversely reflect on his moral character.  *See*

8 C.F.R. § 316.10(b)(3) ("An applicant shall be found to lack good moral character if, during the

statutory period, the applicant . . . (iii) [c]ommitted unlawful acts that adversely reflect upon the

applicant's moral character, or was convicted or imprisoned for such acts."); *see also United*

*States v. Suarez*, 664 F.3d 655, 660–61 (7th Cir. 2011) (according *Chevron* deference to

8 C.F.R. § 316.10(b)).  So Count I is about the crimes, and Count II is about the acts.

The undisputed facts demonstrate that Salem committed unlawful acts that constituted

mail fraud, food stamp fraud, and identity document fraud during the statutory period.  He

admitted that he committed the acts in his Plea Agreement, and during the plea hearing.  *See* Plea

Agreement (Dckt. No. 42-3); Plea Transcript (Dckt. No. 42-5).  He was convicted of crimes of

moral turpitude, which reflect poorly on his moral character.  *See, e.g.*, *United States v.*

*Al-Aqaili*, 550 F. App'x 356, 357 (8th Cir. 2014) ("Acts involving moral turpitude, such as a

crime in which fraud is an ingredient, adversely reflect upon the applicant's moral character.")

(internal citation omitted).

The regulations do allow the Court to consider "extenuating circumstances."  *See*

8 C.F.R. § 316.10(b)(3).  An applicant "shall be found to lack good moral character if, during the

statutory period," the applicant "(iii) [c]ommitted unlawful acts that adversely reflect upon the

applicant's moral character, or was convicted or imprisoned for such acts," unless "the applicant

establishes extenuating circumstances."  *Id.*  "Extenuating circumstances" mean reasons that

15

"render a crime less reprehensible than it otherwise would be, or 'tend to palliate or lessen its guilt.'" *Suarez*, 664 F.3d at 662 (quoting Black's Law Dictionary).

Salem has not shown extenuating circumstances. In fact, he failed to respond to the government's motion in its entirety. He did not respond to its Rule 56.1 Statement of Facts, meaning that any uncontroverted statements are admitted as true. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). He also failed to provide his own Rule 56.1 statement with facts that might demonstrate extenuating circumstances to mitigate his convictions. "Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted). The government moved for summary judgment, and Salem stayed silent instead of "set[ting] forth specific facts showing that there is a genuine issue for trial." *Id.* There's nothing on Salem's side of the ledger.

Courts "apply Section 316(b)(3)(iii) in a direct manner." *See United States v. Dave*, 652 F. App'x 468, 470 (7th Cir. 2016). By pleading guilty to mail fraud, food stamp fraud, and identity document fraud, Salem admitted that he committed acts that reflected adversely on his moral character. "By admitting [these] crimes which reflected adversely on his moral character, [Salem] rendered himself statutorily ineligible for naturalization in this country." *Id.*; *see also United States v. Dor*, 729 F. App'x 793, 799 (11th Cir. 2018) ("[T]he government established by clear, unequivocal, and convincing evidence that Dor illegally procured his citizenship under 8 C.F.R. § 316.10(b)(3)(iii). Because Dor committed a fraud crime during the statutory period, as a matter of law, he lacked the good moral character necessary for naturalization.") (internal citation omitted).

Salem admitted that he committed unlawful acts, and he was later convicted based on his guilty plea. The acts show that he lacked good moral character before he became a citizen,

which means that he was ineligible for naturalization. *See* 8 U.S.C. § 1101(f); 8 C.F.R.

§ 316.10(b)(3)(iii). The Court grants the government's motion for summary judgment on

Count II.

### III. Providing False Testimony to Obtain an Immigration Benefit (Count III)

The government also moved for summary judgment on Count III. That claim alleges that

Salem lacked good moral character because he gave false testimony, under oath, to procure his

citizenship. *See* Cplt., at ¶ 63 (Dckt. No. 1).

Applicants must tell the truth when they apply for U.S. citizenship. The statutory text

confirms common sense: lying is inconsistent with good moral character. "No person shall be

regarded as, or found to be, a person of good moral character who, during the period for which

good moral character is required to be established is, or was . . . one who has given false

testimony for the purpose of obtaining any benefits under this chapter." *See* 8 U.S.C.

§ 1101(f)(6); 8 C.F.R. § 316.10(b)(2)(vi).

The statute "means precisely what it says." *Kungys*, 485 U.S. at 780. "Literally read,

[section 1101(f)(6)] denominates a person to be of bad moral character on account of having

given false testimony if he has told even the most immaterial of lies with the subjective intent of

obtaining immigration or naturalization benefits." *Id.* at 779–81.

On its face, the text of section 1101(f)(6) "does not distinguish between material and

immaterial misrepresentations." *Id.* at 779; *compare* 8 U.S.C. § 1101(f)(6) (lacking a materiality

requirement for false testimony) *with* 8 U.S.C. § 1451(a) (authorizing denaturalization based on

the "concealment of a material fact or by willful misrepresentation"). The statute "is to be given

its plain meaning, denominating one who has made false oral statements under oath with the

subjective intent of obtaining immigration or naturalization benefits." *Kungys*, 485 U.S. at 760.

The "absence of a materiality requirement" in section 1101(f)(6) is explained by the fact that its "primary purpose" is to "identify lack of good moral character." *Id.* at 780. A lack of good moral character appears "to some degree whenever there is a subjective intent to deceive, no matter how immaterial the deception." *Id.*

The undisputed facts confirm that Salem gave false testimony to obtain naturalization benefits. The INS interviewed Salem as part of his citizenship application in May 1993. *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 30 (Dckt. No. 44). Salem promised under oath to answer all of the questions truthfully. *Id.* at ¶ 31. And when the INS asked Salem if he had ever knowingly committed a crime for which he had not been arrested, he answered "no." *Id.* at ¶¶ 32–33.

That answer was false. *See* 8 U.S.C. § 1101(f)(6). When Salem walked into his INS interview, he was in the middle of his food stamp fraud. *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶¶ 11, 30 (Dckt. No. 44). The fraud began years before the interview, and continued for several more years. The context of the lie – an interview about naturalization – confirms that he lied "for the purpose of obtaining any benefits under this chapter." *See* 8 U.S.C. § 1101(f)(6).

Salem's lie wasn't a minor fib. He lied about a long-running, multi-million dollar scheme to steal money from the federal government. He took money destined for the hungry. Again, this statutory provision doesn't require materiality, but even if it did, Salem would have leaped high over the hurdle. Courts have rejected naturalization applications for lies that are, in the grand scheme of things, about less material subjects. *See, e.g., Bijan v. U.S. Citizenship and Immigration Servs.*, 2017 WL 8793430, at *5 (N.D. Ill. 2017) (finding applicant lacked good moral character when he repeatedly lied under oath about his marital status); *Tinoco v. Cioppa*,

2017 WL 3895564, at *5 (N.D. Ill. 2017) (collecting cases); *Babatunde v. Napolitano*, 2011 WL 332523, at *9 (N.D. Ill. 2011); *see also Kungys*, 485 U.S. at 779 ("On its face, § 1101(f)(6) does not distinguish between material and immaterial misrepresentations."). The Court grants the government's motion for summary judgment on Count III.

*  *  *

In Counts I, III, and III, the government established that Salem lacked good moral character during the statutory period leading up to his naturalization. Without good moral character, Salem was ineligible to become a United States citizen. *See* 8 U.S.C. § 1427(a). So his citizenship was "illegally procured." *See* 8 U.S.C. § 1451(a). The Court must enter a judgment of denaturalization against Salem. *See Fedorenko v. United States*, 449 U.S. 490, 517 (1981) ("[D]istrict courts lack equitable discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally or by willful misrepresentation of material facts.").

## IV. Willful Misrepresentation and Concealment of Material Facts (Count IV)

The complaint includes one last count to revoke Salem's naturalization. If an applicant procures a certificate of naturalization "by concealment of a material fact or by willful representation," the government has a "duty" to seek denaturalization. *See* 8 U.S.C. § 1451(a). The statute contains four requirements: (1) "the naturalized citizen must have misrepresented or concealed some fact;" (2) "the misrepresentation or concealment must have been willful;" (3) "the fact must have been material;" and (4) "the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." *Kungys*, 485 U.S. at 767. The government has presented undisputed facts supporting all four requirements.

There is no question that Salem misrepresented and concealed facts.  He defrauded the federal government by stealing millions of dollars from the food stamp program.  *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶¶ 11, 19 (Dckt. No. 44).  But he didn't say anything about it when he applied for citizenship.  Instead, he represented that he was a law-abiding resident and had done nothing wrong.  He falsely represented that he had never "knowingly committed a crime for which [he had] not been arrested."  *Id.* at ¶¶ 26–27.  He certified under penalty of perjury – twice – that he was telling the truth.  *Id.* at ¶¶ 28–29, 34.

Salem's deception was willful.  "A misrepresentation is willful if made deliberately and voluntarily."  *Asentic v. Sessions*, 873 F.3d 974, 981 (7th Cir. 2017).  Salem filed for citizenship in the midst of his scheme.  *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶¶ 11, 25 (Dckt. No. 44).  Salem knew the truth about his long-running fraud, but chose to lie to the INS to cover up his illegality.

Salem's falsehoods were material.  "Materiality" means that something has a "'a natural tendency to influence' a naturalization decision."  *Kungys*, 485 U.S. at 772 ("We hold, therefore, that the test of whether Kungys' concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service.").

The government presented evidence that it would have denied his application if Salem had divulged his criminality.  *See* Pl.'s Local Rule 56.1(a) Statement of Material Facts, at ¶ 36 (Dckt. No. 44).  That's a heavier burden than the government needs to carry (for materiality, anyway).  *See Kungys*, 485 U.S. at 771 ("It has never been the test of materiality that the misrepresentation or concealment would *more likely than not* have produced an erroneous decision . . . .") (emphasis in original).  It is enough if the falsehood had a "natural tendency to

influence." *Id.*; *see also United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009) ("It matters not that there is no firm evidence showing Latchin's application would have been denied absent his lie; Latchin's misrepresentation had a 'natural tendency to influence' the naturalization decision, and that is all that is required."). The federal government would have considered it important that Salem was stealing from the federal government.

Finally, Salem procured citizenship as a result of his deception. The question is whether it is "fair to infer that the citizen was actually ineligible" for naturalization. *See Latchin*, 554 F.3d at 714.[1] Salem was ineligible for citizenship because he was in the process of stealing millions of dollars. He committed multiple crimes involving moral turpitude during the statutory period, all of which adversely reflected on his good moral character. He then gave false testimony, under oath, during his naturalization interview.

In *Latchin*, the Seventh Circuit held that it "defies common sense to think that the INS would have naturalized a man who worked for years as a spy for a hostile regime." *Id.* By the same token, it defies common sense to think that the federal government would have granted citizenship to someone who stole millions of dollars from a program for the needy.

The Court grants the government's motion for summary judgment on Count IV.

## V.    Defendant's Arguments

Salem mustered almost no response to the government's motion for summary judgment. His lawyer filed a four-page brief, late and unsigned. *See* Fed. R. Civ. P. 11(a). Salem did not

---

[1] *Kungys* was a deeply fractured opinion. *See Latchin*, 554 F.3d at 713 ("*Kungys* is not a clean opinion. It is maddeningly fractured."). Justice Brennan "added a more restrictive gloss to Justice Scalia's view." *Id.* at 714. Still, even Justice Brennan agreed that the government can satisfy the "procurement" requirement by presenting evidence "sufficient to raise a 'fair inference of ineligibility.'" *Id.* (quoting *Kungys*, 485 U.S. at 783) (Brennan, J.). Here, the government has satisfied that more restrictive standard.

challenge any of the government's facts. He did not respond to the government's Rule 56.1 statement. And he did not offer any facts of his own.

Salem argues that he was "coerced into pleading guilty" because the government threatened to imprison his wife. *See* Def.'s Resp. to Pl.'s Mtn. for Summary Judgment, at 2 (Dckt. No. 71). And if both of them went to prison, they would have lost their disabled child. *Id.* Salem offers no evidence to support his charge, so it carries no weight. *See* Local Rule 56.1(b)(3)(C) (requiring the opposing party to support any additional facts by presenting "affidavits, parts of the record, and other supporting materials").

Salem also told a different story during the criminal case. The Plea Agreement was clear as a bell: "Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty." *See* Plea Agreement, at ¶ 19 (Dckt. No. 42-3). And at the plea hearing, Salem told Judge Gettleman under oath that no one had threatened him:

| | |
|---|---|
| The Court: | Okay. Mr. Salem, has anybody forced you in any way to plead guilty today? |
| Defendant: | No, sir. |
| The Court: | Has anybody threatened you? |
| Defendant: | No, sir. |

*    *    *

| | |
|---|---|
| The Court: | Except for the promises contained in the plea agreement, have any promises been made to you? |
| Defendant: | No, sir. |
| The Court: | Is your decision to plead guilty entirely voluntary on your part? |
| Defendant: | Yes, sir. |

22

| The Court: | Are you doing it because you are guilty of the counts to which you are pleading guilty? |
| Defendant: | Yes, sir. |

*See* Plea Transcript, at 18:20-24, 19:3-11 (Dckt. No. 42-5).

Even if Salem had offered evidence, it would not matter. He cannot challenge his criminal conviction through the back door in a denaturalization proceeding. Salem "may not now re-litigate issues decided in his criminal case." *United States v. Suarez*, 664 F.3d 655, 663 (7th Cir. 2011); *see also United States v. Jean-Baptiste*, 395 F.3d 1190, 1195 (11th Cir. 2005) (holding in a denaturalization case that the defendant "was precluded from challenging his conviction or his knowledge of having committed the crime"); *United States v. Valenzuela*, 2018 WL 3619503, at *6 (N.D. Ill. 2018) (holding that a defendant in a denaturalization proceeding "may not collaterally attack the judgment" in the criminal case); *United States v. Ep*, 2003 WL 22118926, at *4 (N.D. Ill. 2003) (holding that the Court was "not in a position to entertain" a "collateral attack on the underlying judgment"). Salem had an opportunity in the criminal case to challenge the criminal charges against him. That ship has sailed.

Salem also argues laches. But Salem cannot fault the federal government for not taking away his citizenship fast enough. Laches does not apply to the federal government in a denaturalization proceeding. *See United States v. Hamed*, 2020 WL 5884222, at *4 (8th Cir. 2020) ("[L]aches is unavailable against the United States when it is 'proceeding in [its] sovereign capacity.'") (citation omitted; latter brackets in original); *United States v. Kairys*, 782 F.2d 1374, 1384 (7th Cir. 1986) (noting that federal courts have "consistently disapproved of the use of laches in denaturalization proceeding" because "laches is not a defense against the sovereign"); *United States v. Mandycz*, 447 F.3d 951, 964 (6th Cir. 2006) ("Because the United States acted in its sovereign capacity when it sought to denaturalize Mandycz, the common law doctrine of

23

laches does not apply."); *Costello v. United States*, 365 U.S. 265, 282 (1961) (noting that the Supreme Court has "consistently adhered to [the] principle" that "laches is not a defense against the sovereign," but declining to reach the issue because petitioner could not prove the elements); *United States v. Ahmed*, 2019 WL 4894350, at *6 (N.D. Ill. 2019) (Dow, J.); *United States v. Borgono*, 2019 WL 2436279, at *3 n.6 (S.D. Fla. 2019) ("[W]e have not found a single appellate court that has allowed a defendant to pursue a laches defense in a denaturalization proceeding."). "It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940).

"Consistent with the Government's traditional sovereign immunity, it often is said that claims by the United States, brought in its sovereign capacity to enforce public rights, cannot be barred by the equitable doctrine of laches . . . ." *See* 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3652 (4th ed. 2020). The rule "has enjoyed continuing vitality for centuries." *Mandycz*, 447 F.3d at 964. "The rule *quod nullum tempus occurrit regi* [time does not run against the king] – that the sovereign is exempt from the consequences of its laches, and from the operation of statutes of limitations – appears to be vestigial survival of the prerogative of the Crown. . . . [T]he source of its continuing vitality . . . is to be found in the public policy now underlying the rule . . . ." *Guaranty Trust Co. of New York v. United States*, 304 U.S. 126, 132 (1938) (italics added); 1 William Blackstone, *Commentaries on the Law of England* 240 (1765) ("[T]he law also determines that in the king can be no negligence, or *laches*, and therefore no delay will bar his right.") (emphasis in original). Perhaps the "true reason," as Justice Story noted, "is to be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers." *United States*

*v. Hoar*, 26 F. Cas. 329, 330 (Cir. Ct. D. Mass. 1821). The clock never runs out on the sovereign's duty to protect public rights.

Immigration and naturalization are a core part of sovereignty. *See Arizona v. United States*, 567 U.S. 387, 394 (2012); *Faddoul v. INS*, 37 F.3d 185, 189 (5th Cir. 1994) ("The decision to bestow or deny citizenship is deeply-rooted in national sovereignty . . . ."). Revoking citizenship is "quintessentially" a sovereign act. *Mandycz*, 447 F.3d at 964. The federal government does not lose power over its borders through the passage of time.

Even if laches were theoretically available, this case would not be a good candidate. Laches is an equitable doctrine, and Salem has unclean hands because he procured his citizenship through fraud. He lied to the federal government in his application when he promised under oath that he had not committed any crimes. "[I]n the immigration arena, people who have procured citizenship by way of fraud should not be allowed to escape denaturalization via the laches trap door." *United States v. Arango*, 686 F. App'x 489, 491 (9th Cir. 2017) (Wallace, J., concurring).

Finally, Salem argues that the Court in his underlying criminal case never told him that a guilty plea could have collateral consequences on his naturalization. *See* Def.'s Resp. to Pl.'s Mtn. for Summary Judgment, at 2 (Dckt. No. 71). Salem offers no support for his argument, and thus it is waived. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."); *Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 889 (N.D. Ill. 2014) ("It must be remembered that ours is an adversary system, and it is not the job of judges to do the work of lawyers."); *Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006) ("Judges are

not like pigs hunting for truffles, and the Seventh Circuit has stressed time and again that it is not a judge's responsibility to research and construct the parties' arguments.") (citation omitted).

A failure to advise a criminal defendant of the immigration consequences of a guilty plea may be a reason to challenge the plea itself. *See United States v. Zacahua*, 940 F.3d 342 (7th Cir. 2019). But Salem isn't challenging his plea in the criminal case in this denaturalization proceeding. Perhaps Salem could have challenged his guilty plea on that grounds, but the simple reality is that he didn't. A denaturalization case is not the right time or place to challenge a criminal conviction. *See Suarez*, 664 F.3d at 663.

## Conclusion

For the foregoing reasons, the Court grants the government's motion for summary judgment on Counts I, II, III, and IV.


Date:   October 26, 2020                              _____

                                                      Steven C. Seeger
                                                      United States District Judge

26